ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Lindsay S. Moilanen
Sushila Rao Pentapati
Bari R. Nadworny
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0410 (Rao Pentapati)
pentapatisu@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **COMPLAINT** |
| Plaintiff, | 25 Civ. 1626 |
| -against- | |
| ALAN BURAK, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Alan Burak ("Burak"), alleges as follows:

## SUMMARY

1.      Between at least 2018 and 2023 (the "Relevant Period"), Burak engaged in a

fraudulent scheme primarily targeting Latino investors to raise approximately $4 million in a

purported investment fund called Never Alone Capital, LLC ("Never Alone"), of which he was the

founder and sole member, and misappropriated the bulk of that amount.

2.      To induce prospective investors to invest in Never Alone, Burak presented himself

as a wealthy hedge fund owner, falsely told them that Never Alone was an investment fund, and

claimed that their money would be invested in "Wall Street" pursuant to a complex investment strategy, in some cases with a guaranteed return.

3.    After investors wired funds to Never Alone's bank account, Burak generally sent them fabricated monthly "Account and Activity Statements" purporting to show consistently positive returns from investments in "stocks" and "other."

4.    However, Burak did not invest most of the money provided by investors consistent with his representations.  Instead, he misappropriated the bulk of investor deposits, including to pay for personal travel charges, an adult-only subscription service, and purchases made by his wife.

5.    To the extent that Burak invested any of the investor money through certain brokerage accounts, his trading yielded losses—contrary to the false account statements that Burak fabricated and sent to investors purporting to show that their investments were safe and generating high returns.

6.    In July 2022, when his scheme to defraud investors was in full swing, Burak created an audio recording addressed to himself in which he appeared to take stock of his business and finances and set "goals" for himself for the next six months to a year.  When discussing the current state of his business and finances, Burak admitted that he was "failing every day" because he was fake, that he "did not have a real business," that he was "stealing money from people," that he was losing "more and more" money in trading, and that he did not have "a real LLC," "a real fund," or "a real hedge fund."

7.    Even after this recording, Burak's scheme to deceive investors and prospective investors continued unabated through the spring of 2023, when things began to unravel.  Several investors whose false account statements indicated that their accounts had funds available to withdraw tried to cash out, but Burak manufactured additional lies and excuses to stave off repayments for several months and eventually stopped responding to investors altogether.

8.      To date, most of the investors in Never Alone have not recouped even their initial investment—much less any of the returns Burak promised.

## VIOLATIONS

9.      By virtue of the foregoing conduct and as alleged further herein, Burak has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)].

10.     Unless Burak is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

12.     The Commission seeks a final judgment: (a) permanently enjoining Burak from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Burak to disgorge all ill-gotten gains he received as a result of the violations alleged herein and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Burak to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; (d) permanently prohibiting Burak from, directly or indirectly, including, but not limited to, through any entity

owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts, pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)], Exchange Act Section 21(d)(1) and (5) [15 U.S.C. § 78u(d)(1) and (5)], and Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)]; (e) permanently prohibiting Burak from, directly or indirectly, acting as or being associated with any investment adviser, pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)], Exchange Act Section 21(d)(1) and (5) [15 U.S.C. § 78u(d)(1) and (5)], and Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

14.     Burak, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Burak may be found in, is an inhabitant of, and transacts business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including soliciting, offering, and selling securities to investors and maintaining an office in the District.

## DEFENDANT

16.     **Burak**, age 40, is a resident of New York, New York.  Burak has never been

associated with any entity registered with the Commission.  Burak is the founder, control person, legal representative, and sole member of Never Alone and was also described in investor materials as its Managing Partner.

**OTHER RELEVANT ENTITIES**

17.    **Never Alone** was incorporated as a limited liability company ("LLC") in Wyoming in September 2016 with its principal place of business in Pompano Beach, Florida.  Never Alone claimed to have a New York office address at 757 3rd Avenue, 20th Floor, New York, NY 10017. Since November 9, 2023, Never Alone has been listed as "Inactive – Administratively Dissolved (Tax)."  Throughout the Relevant Period, Burak was Never Alone's founder, sole member, legal representative, and control person.

18.    **Never Alone Capital, Sociedad Anónima Promotora de Inversión de Capital Variable (S.A.P.I. de C.V.)** is a Mexican entity created and controlled by Burak to recruit additional investors in Mexico.

**FACTS**

I.    **BURAK FOUNDED NEVER ALONE AS A PURPORTED FUND FOR WEALTHY INVESTORS.**

19.    On September 19, 2016, Burak incorporated Never Alone as an LLC in Wyoming.

20.    On September 22, 2016, Burak signed an Operating Agreement for Never Alone.

21.    Exhibit A of Never Alone's Operating Agreement listed Burak as its only member, with a 100 percent "capital contribution" and a 100 percent ownership interest.

22.    Burak was the only signatory of Never Alone's Operating Agreement.

23.    By at least 2018, Burak began soliciting investors to invest money in Never Alone, which he described as a fund with a portfolio of different investments in the form of stocks, options, and cash.

24.    In September 2018, Burak appeared on a publicly-available podcast, where he was

introduced as an "investor and entrepreneur who manages Never Alone Capital, a multi-million

dollar investment business."

     25.    Asked to describe Never Alone in the interview, Burak replied:  "It is basically an

asset management firm.  I basically manage people's money…inside the stock market, commodities

and currencies[.]"

     26.    On February 18, 2019, Burak purchased the domain name "neveralonecapital.com"

and registered it in his name.

     27.    Through at least the end of the Relevant Period, the "About Us" section of

neveralonecapital.com, as well as posts published on Burak's publicly accessible LinkedIn profile,

described Never Alone as follows:

> [Never Alone] is a systematic asset management firm.  We handle portfolios
> that include equities, commodities and FX, and invest in companies and
> industries across 22 countries throughout Asia, America, and parts of
> Europe.  We focus on trend-following-option trading, leveraging automated
> systems that analyze past market trends to inform current market behavior.

     28.    During the Relevant Period, Burak also publicly presented himself as an investment

adviser and "coach."

     29.    For example, on March 20, 2019, Burak published a post on his publicly accessible

LinkedIn profile titled "Why Every Financial Expert Should Study Psychology," in which Burak

held himself out as an independent "advisor" and wrote (emphasis in original):

> Advisors associated with an institution will not prioritize you as a client, they
> are only interested in claiming your assets for their employers.  An
> independent advisor makes money when you make money, which makes
> them properly motivated to help you succeed.  When I sit down with a client
> to discuss their goals and aspirations, I make an effort to put myself in
> THEIR shoes.  I measure and match their energy, in order to more
> effectively communicate, and transform their dreams into reality.

     30.    Similarly, in a public post on LinkedIn on May 8, 2019, titled "3 Investment Tips

Wall Street Doesn't Want You to Know," Burak offered investors tips on how to become successful

at investing.

## II. BURAK BEGAN TARGETING THE LATINO COMMUNITY TO RECRUIT INVESTORS.

31.    In December 2018, Burak met Investor A at a seminar in Florida.

32.    Burak told Investor A that he managed money for many people and owned a hedge fund called Never Alone, which required a minimum investment amount of $2 million.

33.    Investor A asked Burak for advice on her portfolio of investments, which Burak provided.

34.    Investor A introduced Burak to her husband and business partner, Investor B.

35.    Investors A and B had founded a media company ("Company A") providing financial education programs in Spanish to the Latino community to empower them to invest in the stock market.

36.    Burak presented himself to Investors A and B as a hedge fund manager with ties to Mexico.

37.    Starting in 2019, Burak was regularly featured on Company A's platforms as a "renowned" expert whose hedge fund managed hundreds of millions of dollars and an instructor for online classes and webinars on investing offered by Company A.

38.    During the Relevant Period, Burak presented at least a dozen courses, "seminars," or "tutorials" on investing to Company A members, including through podcasts and "live" chats on its platforms.

39.    Burak subsequently used his connections to Company A to identify and solicit several investors in the Latino community to invest in Never Alone.

40.    In discussions with these investors, including in Company A classes and promotional materials provided to investors and potential investors and published online, Burak often referred to Never Alone as a fund, a hedge fund ("*fondo de cobertura*" in Spanish), or an investment fund ("*fondo de*

*inversión*" in Spanish).

41.     For example, in connection with "live" sessions with Burak offered to Company A students in 2020 and 2021, Burak was described as "a world-famous investor" and the "owner" or "founder" of "the investment fund[] Never Alone Capital."

42.     In connection with Company A's fourth anniversary in 2023, Burak was described as a "renowned investor…owner and director of the Manhattan-based hedge fund: Never Alone Capital, which manages hundreds of millions of dollars."

## III.    BURAK MADE MATERIAL MISREPRESENTATIONS TO OBTAIN INVESTMENTS.

43.     Burak told prospective (and current) investors that Never Alone followed a complex investment strategy that prioritized preserving their equity and maximizing their returns.

44.     For example, in a publicly-available LinkedIn Post on March 6, 2019, titled "An Introduction to Never Alone Capital," Burak wrote:

> As macro traders, we start with money management, risk management, and then returns.  This is another great differentiator for [Never Alone] because most asset management firms focus on returns first.  They focus on getting quick wins.  But a lot of them don't survive for more than three or four years because they run out of assets.  Our mission at [Never Alone] is to facilitate long-term strategies that enable our clients to build healthy equity in the long run.

45.     In another publicly-available LinkedIn Post on April 10, 2019, titled "3 Reasons Why Projections are Bull[expletive]," Burak wrote (emphasis in original):

> At [Never Alone], we focus on a trend-following strategy, which allows us to find patterns in past behavior to inform future market trends.  Instead of predicting the future of a stock, our strategy is based on these two maxims: 1. **The present is always the reality.**  We follow the price today and invest in what we can see currently, not what we hope to see in the future.  Our strategy stays the same, even as we adapt to market fluctuations.
>
> 2. **To follow trends, you have to understand trends.**  We study past market behaviors using technical and fundamental analysis.  These variables are NOT used to predict the market, but rather to watch for patterns that form over time.

46.    Starting in at least 2022, Burak also provided to prospective investors different versions of a "Never Alone Investor Presentation," which purported to describe the investment objective and strategies deployed at Never Alone.

47.    These presentations typically referenced a minimum investment amount of $1 million to $2 million, but Burak generally allowed investments of lesser amounts, often suggesting that he was providing the investor a special opportunity.

48.    For example, a slide deck titled "Never Alone Capital Investor Presentation January 2022" that was provided to an investor described the investment objective to "[a]chieve returns exceeding the broader Global Equity Markets (measured by the S&P 500 and MSCI World), over a full market cycle. We seek to achieve these returns primarily thru [sic] publicly traded, marketable securities of U.S. and non-U.S. companies."

49.    The slide deck also described Never Alone's investment strategy as "a value-oriented investment process" with a "typical portfolio comprise[d] of 6 – 15 high-quality companies. We don't aim to 'beta-hedge' our positions, as this typically results in sacrificing long-term gains for reducing short-term volatility. We embrace volatility."

50.    The slide deck also purported to provide a representative overview of Never Alone's "Performance (Net of Fees)" over more than a decade—from 2010, years before Burak's 2016 incorporation of Never Alone, through 2021—and claimed returns ranging from 14.31% in 2015 to 21.61% in 2019.

51.    Burak also falsely told investors and prospective investors in Never Alone that their funds would be custodied with a prestigious global financial services firm ("Financial Institution A"), with which Never Alone had a custodial relationship.

52.    Burak's representation that investors' funds would be custodied at Financial Institution A made the investment appear safer and more legitimate to investors and prospective

investors.

53.     But, as Burak knew, Never Alone did not have any custodial agreement or account with Financial Institution A.

54.     Some investors were even given a fictitious document purporting to be an "Execution Copy" of a "Fund of Hedge Funds Custodial Agreement" dated July 30, 2006, between Never Alone and Financial Institution A.

55.     Financial Institution A has no records relating to any such document.

56.     Associated metadata indicate that Burak was the author of this document and that it was created in or around May 2022.

57.     Once investors decided to move forward with their investment in Never Alone, Burak sent them an "Investment Advisory Agreement," drafted in either English or Spanish, which referred to Never Alone, one party to the agreement, as an "Investment Advisor," and to the other party, the investor, as the "Client."

58.     Burak signed the Investment Advisory Agreements on behalf of Never Alone and as its legal representative.

59.     These Investment Advisory Agreements provided that "Never Alone, through its legal representative, hereby states that…it is its will to act as Investment Advisor under the terms and conditions established in this Agreement."

60.     Clause Two of the Investment Advisory Agreements, entitled "Investment Advisory," stated that "[b]y virtue of the Agreement, the Client states that it wishes to receive Investment Advisory services from NEVER ALONE, so that the latter may consequently be able to provide each and every one of the activities that are necessary and convenient," described in an Annex, "which is an integral part of th[e] Agreement."

61.     By entering into the Investment Advisory Agreements, the investors granted Never

Alone "a general mandate to perform actions that empower it to issue instructions to intermediaries in the stock market, consisting of buying, selling, and transferring funds; carrying out any action related to securities, titles, or documents attributable to them or other authorized stock or over-the-counter instructions and any other instrument authorized by law," among other transactions.

62.    The Annex to the Investment Advisory Agreements stated that the administration of funds would be carried out through "shares of public companies, international ETFs, main commodities, and currencies."

63.    The Annex to the Investment Advisory Agreements also specified the compensation arrangement, which was typically represented as a commission on returns generated.

64.    Burak further told some investors that he would only earn a commission after the investor's investment had generated at least a certain rate of return and told other investors (whom he offered a purported "friends and family" opportunity) that they would be charged no fees and no commissions.

65.    Despite the advisory arrangement in the Investment Advisory Agreements, in communications between Burak, on the one hand, and investors and prospective investors, on the other hand, Burak referred to Never Alone as a "fund" or a "hedge fund," and investors and prospective investors similarly described Never Alone as the fund in which they were investing.

66.    To make their investments, investors wired their money to a bank account in Never Alone's name (the "Never Alone Bank Account"), which the Investment Advisory Agreements referred to as the "Investment Fund Account."

67.    During the Relevant Period, Burak was the only authorized signatory on the Never Alone Bank Account.

68.    During the Relevant Period, Burak raised approximately $4 million from at least 17

investors.

69.     At least six of these investors were introduced to Burak and Never Alone due to his affiliation with Company A.

## III.  BURAK'S LIMITED TRADING LOST MONEY, AND HE MISAPPROPRIATED INVESTOR FUNDS.

70.     To the extent that Burak actually invested or traded any of the investors' funds, his trades yielded losses.

71.     Throughout the Relevant Period, Burak also regularly misappropriated most of the investor money.

72.     In several instances, after investors sent their investments to the Never Alone Bank Account, their funds were immediately transferred to accounts in Burak's name, including an account held by Burak and his wife.

73.     Burak then used those funds to pay personal expenses.

74.     For example, on May 19, 2020, an investor sent $25,000 to the Never Alone Bank Account.  Prior to that investment, the account balance in the Never Alone Bank account was just over $400.

75.     The same day, a transfer of $16,000 was made from the Never Alone Bank Account to one of Burak's personal bank accounts.

76.     Later that same day—May 19, 2020—Burak made a credit card payment of $16,000 from that same personal bank account to an American Express account with credit cards held by both Burak and his wife.

77.     During the two-week period before the investor's May 19, 2020 investment, charges to this American Express account included the following charges made to Burak's wife's credit card: $384.45 for skin care on April 30, 2020; $146.27 to a clothing store on May 14, 2020; and $228.09 to a department store on May 16, 2020.

78.     On or around July 25, 2022, while his scheme to defraud investors was in full swing, Burak created an audio recording in which he addressed himself and appeared to take stock of the state of his business and finances and set "goals" to "better" himself in the coming months.

79.     In the recording, Burak described Never Alone as a fake fund with no real business, no growth, and no real cash flow or clients:

> Alan, what's going on in your life?  I am exhausted.  I feel that…I feel that I am failing every day.  I am failing because I am fake.  I have no real business. I am literally stealing money from people.  I have no business.  I haven't paid my taxes.  I am not growing at all.  I don't have a real LLC.  I don't have a real fund.  I don't have a real hedge fund.

80.     Burak also repeatedly admitted that his efforts to make money from trading had failed, that he was just losing "more and more" money in the markets, and that one of his goals was to "get better in my trading."

81.     Even after making this recording, Burak continued to misappropriate money from investor funds.

82.     For example, the Never Alone Bank account received over $140,000 in investor deposits from December 2022 through mid-February 2023.

83.     From February 13 through February 27, 2023, Burak made 14 payments totaling $7,865 directly from the Never Alone Bank Account toward the balance of his Chase Freedom personal credit card.

84.     In that same time period, charges to Burak's Chase Freedom personal credit card included the following charges:  $689.85 to a luxury mountain resort on February 20, 2023; $1,507.98 to a parking application for parking in New York City on February 18, 2023; and charges to music and entertainment platforms, as well as to an adult-only subscription service.

## IV.    TO CONCEAL HIS SCHEME, BURAK SENT INVESTORS FALSE ACCOUNT STATEMENTS.

85.     During the Relevant Period, Burak regularly sent most investors monthly statements

of purported account activity in PDF documents titled "Account and Activity Statements."

86.    These Account and Activity Statements included a purported "overview" of the investment over time with consistently positive returns on investors' money—both as an "average" percentage return for the period and as a "cumulative" return.

87.    The Account and Activity Statements also included balance information; "Ending Allocation" details describing what percentage of the investor's investment was in cash, stocks, or other; and a chart purporting to show the increases in "Net Asset Value" by month.

88.    Burak fabricated these Account and Activity Statements.

89.    The Account and Activity Statements' representations about investment allocations and positive returns were fictitious, were not tied to any actual transactions or trades, and concealed that Burak had lost through trading, or misappropriated, much of the investments made in Never Alone.

## V.    BURAK CONTINUED TO MAKE THE SAME MISREPRESENTATIONS TO EXISTING AND PROSPECTIVE INVESTORS UNTIL HIS SCHEME UNRAVELED IN 2023.

90.    In the year after making his recording, Burak continued to make the same false representations alleged above in paragraphs 43 through 69 about his successful trading record, investment strategies, and guaranteed returns to existing and prospective investors in his purported Never Alone fund.

91.    As investors began complaining about Burak and demanding their money back, Burak manufactured additional lies and excuses to delay repayments and to avoid disclosing that he had either lost or squandered their funds and had no ability to repay them, including in the examples alleged in paragraphs 119 through 121, 138 through 139, and 143 through 148, below.

92.    By April 2023, Burak had drained the primary Never Alone Bank Account into which investors in Never Alone had deposited their funds.

14

93.    On May 4, 2023, the Never Alone Bank Account was closed.

## VI.    MOST OF BURAK'S VICTIMS LOST THEIR INVESTMENTS.

94.    Most of Burak's victims lost their investments in Never Alone after investing based on Burak's misrepresentations.

95.    Below are examples of Burak's misrepresentations between June 2022 through the fall of 2023 to four investors (all associated with Company A) to induce them to invest in Never Alone.

96.    To date, as described below, none of these four investors has received even their initial investments back from Burak.

### A.    Investor C Lost $30,000 After Investing in Never Alone in June 2022.

97.    In or about 2021, Investor C first heard about Never Alone from Burak and Investor A in connection with online classes she was taking with Company A.

98.    During these classes, Burak mentioned that he had a fund, which prompted Investor C to contact Burak and inquire about investing.

99.    On June 6, 2022, Investor C emailed Burak:  "I would like to know what are the requirements to invest with you and the minimum capital."

100.    That day, Burak responded and asked Investor C which country she lived in and how she had learned about Never Alone.

101.    Investor C responded:  "Hi I live in the USA, I heard about you through [Company A].  And I am studying with [Company A], but I was interested in your fund, so I would like to know the requirements and if it is possible, then go ahead and if not, I will move on."[1]

102.    Burak responded, "If you come from [Company A], the minimum is US$15,000.

---

[1] The quotations in paragraphs 99, 101, 102, 104, 105, 110, 111, 112, 118, 119, 120, 121, 127, 152, 166 have been translated from Spanish.

Requirements are to sign a contract and send us ID, proof of address and beneficiaries for the account."

103.    On June 8, 2022, Investor C emailed Burak the required information, and Burak sent her a copy of the Investment Advisory Agreement.

104.    Between June 8 and June 9, 2022, Investor C emailed Burak several questions about the Agreement, including, "[I]n which broker or bank will I see the movements that are going to be made? such as: the capital I start with, how money moves and how it is diversified?"

105.    Burak responded:  "Monthly I will be sending you internal reports on how your capital is, your interests and in which industries, sectors it is moving.  There are also a couple of graphs and historical data [you will be receiving]."

106.    On June 10, 2022, Investor C emailed a signed Investment Advisory Agreement back to Burak.

107.    The Annex to Investor C's Investment Advisory Agreement stated that the investment would last for one year from the first deposit, with an option to renew, and that Investor C had "the right from month 06 to withdraw 100% of the capital and returns" by giving Never Alone five business days' notice.

108.    The Annex also provided that "[a] 20.00% commission on returns is generated after 10% interest."

109.    The same day, Investor C wired $30,000 to the Never Alone Bank Account.

110.    Burak confirmed receipt of Investor C's money and added that "it will start generating returns today itself."

111.    Investor C then thanked Burak for "allowing me to be part of your fund," to which Burak replied, "It will be a pleasure to support you in increasing your and your family's assets."

112.    Investor C wrote back:  "Yes, I know, that I am with the best, to make my savings

grow!!.  And well.. here I will continue learning at [Company A], because thanks to you, I opened my eyes to my finances in many things. […] In the meantime I will wait for the account statements you send me[.]"

113.    Starting in July 2022, Burak emailed Investor C monthly "Account and Activity Statements," each falsely showing a positive return on Investor C's investment.

114.    In or around February 2023, Burak called Investor C to solicit additional investments in Never Alone.

115.    Burak told Investor C that "it was the right time" to invest more money.

116.    Investor C declined Burak's offer to invest more funds in Never Alone.

117.    On June 9, 2023, Investor C emailed Burak requesting her Account and Activity Statement for the previous month of May 2023.

118.    Investor C explained in her email:

> I have already completed a year with you, and I would like to withdraw the money.  I understand that I could do this after completing a year.  We have bought a house and I am remodeling it, so I am going to invest it there…. [A]nd I am very grateful for all the confidence and the pleasure of having been part of this marvelous fund and having met you.  Thank you very much and I am looking forward to what's next.

119.    Later that day, Burak replied:  "Yes, today afternoon I will send you the report and the steps for the transfer.  Thank you for the trust."

120.    On June 12, 2023, Burak emailed Investor C her purported Account and Activity Statement for May 2023 and a list of the information he needed to liquidate her investment and to transfer the "amount stated in [Investor C's] last report" to her.

121.    Burak claimed that the transfer would take "about three business weeks."

122.    The purported May 2023 Account and Activity Statement represented that Investor C's investment had grown by an "average" of 17.78% and had an ending net asset value of "$35,333.82."

123. That day, Investor C provided the requested information, which Burak confirmed he received on June 16, 2023.

124. On July 7, 2023, Investor C emailed Burak noting that the three weeks had passed and inquiring when she would receive the money.

125. Burak did not respond.

126. Investor C followed up several times in 2023, demanding the return of her $30,000 investment as promised by Burak.

127. For example, on August 31, 2023, Investor C wrote: "Maybe for you 30k doesn't mean anything!! [B]ecause you are a millionaire, but for us it is effort, sacrifice and honest work, to earn that money, as I told you once it is the heritage of us and my daughters, and you simply vanished it."

128. Investor C continued to follow up with Burak, but to date has not received even her initial investment back, much less any returns promised by Burak.

**B.    Investors A and B Lost $25,000 By Investing in Never Alone in February 2023.**

129. In or around January 2023, Burak told Investors A and B that in February 2023, he was starting a 90-day "horse race fund" only for friends and family with a minimum investment of $25,000 and "at least 50% return."

130. On February 13, 2023, Investor B emailed Burak a signed Investment Advisory Agreement agreeing to invest $25,000 in Never Alone.

131. The Investment Advisory Agreement executed by Investor B stated on its cover: "Never Alone Capital 'Horse Race' February – May 2023" and "At least 50% Return!"

132. The Annex to Investor B's Investment Advisory Agreement purported to provide a special "friends and family" deal, including a representation that there were "No Fees and No Commissions."

133.    The Investment Advisory Agreement also purported to give Investor B the right to withdraw "100% of the capital and returns" starting on May 31, 2023.

134.    Investor A was listed as the beneficiary of Investor B's Investment Advisory Agreement.

135.    On February 13, 2023, Investor B wired $25,000 to the Never Alone Bank Account.

136.    On March 13, 2023, Burak sent an email (blind copying both Investors A and B) with the subject line "Horse Race Update," soliciting additional investments in the "horse race fund," and claiming, "At the moment our horse race fund is **+ 24.71%!!! Congratulations!**" (emphasis in original).

137.    In April 2023, Investor A asked Burak to withdraw the money Investors A and B had invested in Never Alone.

138.    In response, Burak told Investor A that there was an issue with Financial Institution A, the purported fund custodian.

139.    Burak also claimed that investors could not withdraw money until Financial Institution A completed its diligence.

140.    In reality, Never Alone did not have any relationship or accounts with Financial Institution A, as alleged in paragraph 53 above.

141.    Over the following months, Investors A and B made several attempts to get their money back from Burak.

142.    On June 19, 2023, Investor A emailed Burak and wrote:

Per our written agreement attached, we have been waiting to receive our funds since May 31st.  It's been almost 3 weeks.  Please send them by tomorrow June 20th at 5pm.  This is affecting our finances for both the company and personal as we were counting on these funds for the month of June and we still don't have them[.]

143.    On June 30, 2023, after Burak texted him requesting a phone call, Investor B wrote

to Burak in an email:

> If you have anything else to say to us please answer our emails and put it in writing. We are done with the pointless phone calls and broken promises. You are either going to return the money we invested in your fund and keep your word, or you are not.

144.    On July 10, 2023, Investor B wrote to Burak threatening legal action to secure the return of funds invested by investors associated with Company A:

> You have lied to us numerous times about sending the wire transfer, telling us to check our account for the funds, insulting our intelligence as we both know that the money was never sent. […]  Over the past few weeks, we have received multiple emails from people who invested into your fund and like us, have also not received their money yet. Some of them even claim that you called them privately last year. You failed to disclose to us that you were soliciting investments from non-accredited investors from our community into your fund and your behavior appears to violate multiple federal laws and SEC regulations here in the United States.

145.    Burak replied the next day:  "I will send you between today and tomorrow a table with the amounts of each individual from [Company A] that invested and the exact day (in the coming days) that all of you will be receiving the money back."

146.    On July 12, 2023, Burak sent counsel for Investors A and B a table listing five investors associated with Company A, the planned return dates for their investments, and the purported total value of their investments, including the purported returns on their initial investments.

147.    For example, Burak's table listed Investor B's total investment value as $33,012.50—falsely indicating that Investor B's $25,000 investment had grown by over 32% since February 2023—and was to be returned by July 30, 2023.

148.    After repeated follow-ups, Burak again represented to counsel for Investors A and B on August 18, 2023, that Burak's "priority [wa]s to ensure the timely return of the investors' money before the end of the month."

149.    To date, despite persistent efforts, Investors A and B have not received any money

back from Burak.

C.     **Investor D Lost $25,000 By Investing in Never Alone in February 2023.**

150.    Like Investor C, Investor D learned about Never Alone through online Company A

classes hosted by Investor A and Burak.

151.    In these classes, Burak frequently mentioned his hedge fund.

152.    On February 2, 2023, Burak emailed Investor D directly:

> I don't know if [Investor A] or anyone from [Company A] has told you that
> this year one of my goals is to expand my support to traders and investors.
> That is why I am accepting 5 additional persons for 1 on 1 coaching.  If you
> are interested, send me your cell and we will discuss.

153.    Investor D agreed to speak with Burak on February 9, 2023, about the coaching

opportunity.

154.    On the call, Burak told Investor D that his fee for one-on-one coaching was $70,000,

which Investor D declined as being too high.

155.    Burak then pivoted to offering Investor D the opportunity to invest in Never Alone.

156.    On the call, Burak told Investor D that the minimum investment was $25,000 with

returns between "10 to 18 percent," and that Investor A had convinced him to offer the investment

to support Company A's students.

157.    Investor D was excited to hear about this opportunity because she understood that

the minimum amount to invest with Never Alone was typically higher.

158.    On the same call, Burak claimed that Investor D's money would be invested in "Wall

Street" and options.

159.    Burak also promised Investor D that her return would be greater than 10% and that,

if it was less, he would not charge her.

160.    On February 9, 2023, following their call, Burak sent Investor D a template

Investment Advisory Agreement to review and a list of required information, which Investor D

provided on February 13, 2023.

161.    On February 14, 2023, Burak sent Investor D a copy of the Investment Advisory
Agreement to execute.

162.    The next day, Investor D emailed Burak the signed Investment Advisory Agreement
and wired $25,000 to the Never Alone Bank Account.

163.    In substance, Investor D's executed Investment Advisory Agreement contained
terms similar to those provided to Investor C.

164.    Specifically, Investor D's investment was for one year, with the option to renew;
Investor D had "the right from month 06 to withdraw 100% of the capital and returns" by giving
Never Alone five business days' notice; Investor D was to receive "monthly and/or weekly reports
detailing the movements of the funds"; and "[a] 20.00% commission on returns" would be
"generated after 10% interest."

165.    Between the time she sent her funds to the Never Alone Bank Account in mid-
February 2023 and at least July 10, 2023, Investor D did not receive any reports or statements
showing or purporting to show the value of her investment in Never Alone.

166.    On July 10, 2023, Investor D emailed Burak asking for her investment to be
returned:

> I sent you a text to the cell phone number you contacted me about to try to
> talk to you. As I told you in the text, regarding what we also talked about
> when I agreed to invest in Never Alone Capital $25,000.00. We agreed that I
> would be sent monthly reports of the performance of my investment and I
> have not received a single one, I have decided that I no longer want to
> continue investing with Never Alone Capital and I want to ask you to return
> my money as soon as possible. You have my account information but if you
> need any other information let me know and I'll gladly send it to you.

167.    Burak did not respond to Investor D.

168.    On August 15, 2023, Investor B informed Burak that Burak's purported "client list"
of Company A investors, whom he had promised to repay by certain dates in July and August 2023,

22

had omitted Investor D's investment.

169.    On August 18, 2023, Burak emailed counsel for Investors A and B an updated list of six investors associated with Company A. This list included Investor D's $25,000 investment in Never Alone and a commitment to return the amount to Investor D by the end of August 2023.

170.    To date, Investor D has not received any money back from Burak.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

171.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 170.

172.    Burak, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

173.    By reason of the foregoing, Burak, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

174.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 170.

175.    Burak, directly or indirectly, singly or in concert, in connection with the purchase or

sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

176.    By reason of the foregoing, Burak, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)

177.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 170.

178.    At all relevant times, Burak was an investment adviser under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].  Burak acted as an investment adviser to the purported investment fund, Never Alone, and/or Burak acted on behalf of Never Alone as an investment adviser to the clients that signed Never Alone Investment Advisory Agreements.

179.    Burak, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, has (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

180.    By reason of the foregoing, Burak, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C.

§§ 80b-6(1) and 80b-6(2)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

**I.**

Permanently enjoining Burak and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Advisers Act Sections 206(1) and 206(2)

[15 U.S.C. §§ 80b-6(1) and (2)];

**II.**

Ordering Burak to disgorge all ill-gotten gains he received directly or indirectly, with pre-

judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act

Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Burak to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C.

§ 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e)

[15 U.S.C. § 80b-9(e)];

**IV.**

Permanently prohibiting Burak from, directly or indirectly, including, but not limited to,

through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale

of any security, provided, however, that such injunction shall not prevent him from purchasing or

selling securities for his own personal accounts, pursuant to Securities Act Section 20(b) [15 U.S.C.

§ 77t(b)], Exchange Act Section 21(d)(1) and (5) [15 U.S.C. § 78u(d)(1) and (5)], and Advisers Act

Section 209(d) [15 U.S.C. § 80b-9(d)];

## V.

Permanently prohibiting Burak from, directly or indirectly, acting as or being associated with any investment adviser, pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)], Exchange Act Section 21(d)(1) and (5) [15 U.S.C. § 78u(d)(1) and (5)], and Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)], provided, however, that this injunction shall not prevent Burak from being a customer or client of an investment adviser; and

## VI.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
       February 26, 2025

                /s/ Sushila Rao Pentapati
                Antonia M. Apps
                Tejal D. Shah
                Lindsay S. Moilanen
                Sushila Rao Pentapati
                Bari R. Nadworny
                Attorneys for Plaintiff
                SECURITIES AND EXCHANGE COMMISSION
                New York Regional Office
                100 Pearl Street
                Suite 20-100
                New York, NY 10004-2616
                (212) 336-0410 (Rao Pentapati)
                pentapatisu@sec.gov